**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Don S. PETERS; Bernard Lounsbury; Jimmie Lee Pfeffer; and Bonaventure A. Kreutzer, Jr., Defendants.**

No. 88–1720–K.

United States District Court, D. Kansas.

April 19, 1990.

Stephen J. Crimmins, Eric S. Seltzer, S.E.C., Washington, D.C., for plaintiff.

Mark F. Anderson, Joseph, Robison & Anderson, Wichita, Kan., for Don S. Peters.

Robert J. Roth, Hershberger, Patterson, Jones & Roth, Wichita, Kan., for Bernard Lounsbury.

Ronald L. Nieto, Arst, Loyd & Nieto Wichita, Kan., Lee I. Levinson, Gasaway,

Levinson & Bennett, Tulsa, Okl., for Bonaventure A. Kreutzer, Jr.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

The present case involves a civil action brought by the Securities and Exchange Commission (SEC) under the Securities Exchange Act. The matter is now before the court on the motions for summary judgment of defendants Peters and Lounsbury. In addition, defendant Lounsbury has filed a motion seeking a separate trial.

These motions were argued before the court in a hearing held April 4, 1990, at which time the court expressed its views on the merits of defendants' motions. Consistent with the statements of the court at that time, and for the reasons discussed herein, the motions of the defendants Peters and Lounsbury for summary judgment are hereby denied. Defendant Lounsbury's motion for a separate trial is also denied.

### Defendant Peters' Summary Judgment Motion

The motion for summary judgment by defendant Peters contains two main arguments. First, he contends that there is insufficient evidence that he engaged in any insider trading or had access to any inside information. Second, he argues that even if he had inside information, he owed no duty to disclose this knowledge or refrain from trading. Peters contends that the misappropriation doctrine, which imposes such a duty, should not be applied in the present case.

### 1. Sufficiency of the Evidence

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.'"* *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R. Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The standard of evidence controlling in the present case is that of a preponderance of the evidence. In *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), the Supreme Court held that a civil suit under § 10(b) of the Securities Exchange Act requires proof by a preponderance of the evidence. The Court reversed the decision

of the Fifth Circuit which, analogizing the matter to common law fraud, had required proof by clear and convincing evidence. Considerations applying to common law fraud were not controlling

> since the historical considerations underlying the imposition of a higher standard of proof have questionable pertinence here. Moreover, the antifraud provisions of the securities laws are not coextensive with common-law doctrines of fraud. Indeed, an important purpose of the federal securities statutes was to rectify perceived deficiencies in the available common-law protections by establishing higher standards of conduct in the securities industries.

459 U.S. at 388–89, 103 S.Ct. at 690–91 (citations and footnotes omitted). The Court then concluded that proof by a preponderance of the evidence satisfied the need to fairly allocate the risk of error and to identify the relative interests of the parties in the outcome of the matter. *Id.*, at 389–90, 103 S.Ct. at 691–92. The Court stated that while the defendants in a case under § 10(b) face

> the risk of opprobrium that may result from a finding of fraudulent conduct, [such] interests in a securities case do not differ qualitatively from the interests of other defendants sued for violations of other federal statutes such as the antitrust or civil rights laws, for which proof by a preponderance of the evidence suffices.

*Id.*, at 390, 103 S.Ct. at 691.

█ Based upon the memoranda advanced by the parties and the record presented to the court in the present case, the following facts may be taken as uncontroverted. As required under the rules relating to summary judgment, any necessary inferences or disputes of fact are resolved in favor of the nonmovant SEC.

In October, 1982, Ivan West and Wayne Swearingen entered into a written contract with Energy Resources Group, Inc. (ERG), in which they agreed to provide consulting services to assist in finding an investor willing to purchase $100 million of ERG convertible, callable, voting stock. The following year, West, Gary Gamm, and defendant Peters formed a partnership known as Investment Management Group (IMG). According to the terms of the partnership, West's consulting work for ERG was excluded from the work of the IMG partnership, and there was to be no relationship, business or otherwise, between West and the other partners relating to the ERG consulting work. A relationship of trust and confidence existed between the IMG partners relating to all of the partners' work, including West's consultation work for ERG.

On Sunday, October 28, 1984, West received a telephone call informing him that Broken Hill Proprietary Company, an Australian company, had commenced work directed at acquiring ERG. West immediately phoned Swearingen. West and Swearingen proposed to meet with ERG officials over dinner Monday or breakfast Tuesday to discuss their finder's fee and discuss their role in pricing the transaction. In his deposition, West denies learning the proposed price Broken Hill intended to pay for outstanding ERG stock on October 30. Swearingen's notes, however, indicate that he and West learned on or about October 30 from the chairman of ERG that Broken Hill intend to pay $6.00 or more for ERG stock during the acquisition.

Broken Hill and ERG officials met in San Francisco over the weekend of November 3 and 4. On Monday, November 5, 1984, trading in ERG stock was temporarily suspended on the NASDAQ system pending an announcement. Later the same day, ERG and Utah International, Inc., a wholly-owned subsidiary of Broken Hill, jointly announced a merger agreement. Under the agreement, Broken Hill Proprietary Holdings (USA), another wholly-owned subsidiary of Broken Hill, would make a tender offer of ERG's stock. The tender offer was commenced on November 8, with the Broken Hill holding company extending a public offer for ERG shares at $6.10 per share. The tender offer was finally completed in March, 1985.

The present action arises out of the conduct of Ken Mick, a stockbroker and busi-

ness associate of Peters. In late October of 1984, immediately prior to the announcement of the ERG–Broken Hill merger, Mick encouraged several of his clients to purchase ERG stock. These clients have testified that Mick told them he had inside information that ERG would soon be bought by another company. Mick indicated that the source of the inside information was Peters.

During the six months prior to October, 1984, Mick had sold no ERG stock. Mick had no underwriting or other special distribution agreement relating to ERG stock which required special emphasis or selling efforts on his part. Nor did he or any of the favored customers of his firm have a substantial long position in ERG which needed to be liquidated. Mick would thus earn the same commission whether he sold ERG or another over-the-counter stock, and should have had no special interest in pushing ERG stock.

John Nickelson was one of the clients approached by Mick about the ERG stock. Mick told Nickelson that he had inside information that ERG's stock was going up. Mick told Nickelson that he would double his money within a week, but that to gain the "inside scoop," he would have to share half his profits with Mick. He also told Nickelson that the ultimate source of the information was a man named West. Nickelson, however, refused to go along with the proposed deal.

Q. He said—what did he say he knew definitely?

A. Yeah. He said he definitely knew 'cause he had some inside information that it was gonna go, you know.

. . . .

Q. And what did he tell you on that point?

A. He just told me he had a guy on the inside was going to, you know, feed him the information and—but he lied so much to me before that I didn't believe him.

. . . .

A. So I didn't get involved in it.

Q. Did he give you the names of any of the individuals on the inside?

A. He just mention one name, West. I don't know who West is. . . .

. . . .

Q. What did he tell you about West?

A. Well, he said that was his, you know, feed man that give him the information. Well, shoot, I didn't know who he was and wasn't about to spend any money to find out.

(Nickelson Depo., pp. 9–10.)

Another customer approached by Mick was defendant Jimmie Lee Pfeffer. Mick told Pfeffer that he had inside information from Peters of a tender offer for ERG. Mick told Pfeffer that the tender offer would be announced the following Monday or Tuesday, and that the offering price would be around $6.00.

Q. Did he tell you anything else about ERG, other than he had a hot tip and everybody in Wichita was buying it?

A. You know, he told me he had some inside information that—when he asked me if I knew any of the board members or the officers I said, "No, I don't know anybody. I don't know a stockholder in ERG." And he said, "Well, would you be interested if I told you where I got my tip?" And I said, "Where did you get it?" And he said Mr. Peters tipped him on it, that somehow he knew someone in a bank, Fourth National Bank or something. . . .

. . . .

Q. Did Mr. Mick ever tell you what it was that he claimed that Peters had told him about ERG?

A. He said it was probably a probable buy out or tendering offer company. Now, he didn't specify that Peters had told him that. He just said Peters had also tipped him on it. I don't recall him saying exactly what Peters told him.

(Pfeffer Depo., pp. 58–59.)

As with Nickelson, Mick demanded half of Pfeffer's profits on the ERG stock. Unlike Nickelson, Pfeffer agreed to the arrangement and purchased the ERG stock. Mick told Pfeffer that he and Peters had an

agreement to split the other half of the profits, which Pfeffer was instructed to wire to a Kansas account of Waterloo, Inc., a company controlled by Mick.

Mick also told Sharyl Lynn Shoffner, a friend and client, of an upcoming acquisition of ERG. In her deposition, Shoffner testified that one evening she and Mick

> were talking about Ernie Doyon. And he said that he had made a lot of money for Ernie, and that what he'd done was he sold him some Energy Reserve stock, and that it was a buy-out. And that's the reason—it was going to be a buy-out or something. And that's the reason he was going to make a lot of money. That's all he said to me, you know. And then I said: Well, how do you know that? And he said: 'Cause Don Peters told me.

(Shoffner Depo., p. 29.)

Finally, Mick also told a co-worker, Donna Alexander, that ERG would soon be acquired, but that Alexander must not tell anyone about it. When she asked Mick the source of his information, he told her, "I can't tell you, I won't tell you." Mick also explained why one of his clients, defendant Kreutzer, bought his ERG stock from another broker. Mick told her that he had told Kreutzer to "go down the street and buy it," rather than purchase the stock through Mick.

In the three trading days prior to the announcement of the ERG–Broken Hill, four clients of defendant Mick purchased 170,000 shares of ERG stock. The purchases of these four clients represented half of all reported volume nationally in ERG stock on October 29, 1984, and 10% of the entire national volume throughout the entire week.

Defendant Pfeffer purchased 100,000 shares of ERG stock during the last three trading days prior to the announcement. Investing some $380,000.00 in the accounts of himself, his son, and an employee, Pfeffer was able to sell the stock on the following Wednesday for over $590,000.00. Defendant Lounsbury, buying 10,000 shares of ERG on October 31 for $35,000.00, was able to sell the same shares less than a week later for nearly $60,000.00. Defendant Doyon purchased 50,000 shares on October 31 and November 1, which he then sold on November 2 and 6, making a profit of nearly $80,000.00. And defendant Kreutzer, buying through another broker at Mick's suggestion, purchased 10,000 shares for $38,125.00, which he was later able to tender to Broken Hill for $61,000.00. The details of this trading are shown below in Table 1.

Table 1

Stock Transactions by Customers of Mick

A. Defendant Pfeffer

| | | | | | |
|---|---|---|---|---|---|
| October | 31: | Buys | 50,000 shares | @ | $3½ |
| November | 1: | Buys | 18,500 shares | | 3¾ |
| | | Buys | 1,500 shares | | 3⅝ |
| | | Buys | 5,000 shares | | $3^{11}/_{16}$ |
| November | 2: | Buys | 25,000 shares | | 4.48 |
| November | 7: | Sells | 50,000 shares | | $5^{15}/_{16}$ |
| | | Sells | 25,000 shares | | $5^{15}/_{16}$ |
| | | Sells | 25,000 shares | | $5^{15}/_{16}$ |

B. Defendant Lounsbury

| | | | | |
|---|---|---|---|---|
| October | 31: | Buys | 10,000 shares | 3½ |
| November | 6: | Sells | 8,000 shares | $5^{29}/_{32}$ |
| | | Sells | 2,000 shares | $5^{15}/_{16}$ |

C. Defendant Doyon

| | | | | |
|---|---|---|---|---|
| October | 31: | Buys | 14,000 shares | 3½ |
| | | Buys | 22,500 shares | 3½ |
| November | 1: | Buys | 6,500 shares | 3⅝ |
| | | Buys | 7,000 shares | 3½ |
| November | 2: | Sells | 25,000 shares | 4.40 |
| November | 6: | Sells | 25,000 shares | 5⅞ |

D. Defendant Kreutzer

| | | | | |
|---|---|---|---|---|
| November | 1: | Buys | 10,000 shares | $3^{13}/_{16}$ |
| January | 2: | Sells | 10,000 shares | 6.10 |

In his brief, defendant Peters stresses Doyon's sale of 25,000 shares on Friday, November 2, prior to the announcement of the ERG–Broken Hill acquisition the following Monday. But this does not disprove the presence of insider information. It is important to note that by Friday the price of ERG stock had already jumped significantly in price, so that even prior to the announcement of the tender offer Doyon was able to realize a profit of nearly a dollar per share. And, of course, Doyon retained another 25,000 shares which were not sold until after the tender offer announcement. Under these circumstances, Doyon's sale of shares on November 2, at a considerable profit, fails to conclusively prove the absence of inside information.

Just as there was significant trading in ERG stock by Mick's customers immediately prior to the tender offer announcement, there is also evidence of a pattern of unusual payments from these customers to Mick, and from Mick to Peters. On November 14, 1984, Mick wired Pfeffer's net profits of $207,000.00 to Pfeffer's brokerage account in Texas. The following day, Pfeffer wired $103,500.00 from this account to an account at the Boulevard State Bank in Wichita. The account was in the name of Waterloo II, Inc., an inactive corporation established and controlled by Mick.

On November 7, defendant Doyon wrote a personal check for $25,000.00 to Waterloo, Inc. On November 14, Mick gave Peters a post-dated check for $43,000.00. The check was drawn on an account in Mick's name at the Boulevard State Bank. The face of the check contains a notation that it is for "consulting fees." On March 22, 1985, defendant Kreutzer wrote a check for $16,000.00 to Kenneco, an oil company controlled by Mick.

Defendants Mick and Peters had been involved in several previous business ventures and were experiencing financial difficulties. Peters periodically extended loans to Mick to cover the operations of these enterprises, and by October, 1984 Mick owed Peters a sum in excess of $100,-000.00.

Mick and Peters were shareholders in several corporations: Celtek, Tectel, Rexmoor, and Gateway Pizza. A plan to publicly offer Celtek, Inc. stock in early 1984 did not go forward, leaving the company with minimal revenues during its development phase. The corporation had outstanding bank loans of over $1 million. Both Mick and Peters had personally guaranteed Celtek's obligations. Between April and October, 1984, Peters personally advanced over $200,000.00 to Celtek to continue its operations. On October 1, 1984, Celtek's bank sent a letter requiring Mick and Peters to pay $500,000.00 on their guaranties. According to Mick's subsequent testimony, Celtek was short on capital and was "sinking". Mick and Peters again guaranteed Celtek's debts on October 29, 1984, which at that time exceeded $1.2 million. On November 27, 1984, several days after receiving the $43,000.00 payment from Mick discussed above, Peters paid $41,116.66 to Celtek's bank.

In addition to his role as a major stockholder, Peters was also a director of Tectel, Inc. Mick was a shareholder and had helped take Tectel public. On July 10 and 27, 1984, Peters promised to loan Tectel $500,000.00, and by the end of 1984 Peters had loaned $240,000.00 to the corporation. On September 20, 1984, Peters was sued by another Tectel stockholder for $675,000.00.

Both Mick and Peters had guaranteed the obligations of Rexmoor, Inc. Rexmoor's public offering, planned for March 1984, was a failure. Mick's brokerage firm had acted as the dealer-manager for this offering, and its failure caused serious financial difficulty to Mick.

Mick, Peters, and defendant Lounsbury were shareholders of Gateway Pizza, Inc., and Peters and Lounsbury were guarantors of the corporation. Mick's firm acted

as underwriter when a public offering of the corporation was made in November, 1983. The offering did not succeed, and Gateway Pizza was subsequently liquidated.

In addition to these dealings, both Mick and Peters were owners of a real estate development in Hutchinson, Kansas, involving 58 condominiums and an office building. Peters and Mick had financed their 1983 purchase at a cost of $1.35 million. Mick and Peters had planned to refurbish and sell the properties, but by the end of 1984 all of the units remained unsold. During 1984, the properties operated at a loss of $189,000.00.

The remaining focus of the present case revolves around the potential access of Peters and Mick to material, nonpublic information relating to negotiations between ERG and Broken Hill. Defendant Peters contends that under the practices of West and the circumstances present at the IMG offices during the relevant time period, it was impossible for him to have obtained any information about ERG. In general, this argument is based on Peters' denial of ever speaking with West about ERG, that he never looked at any documents relating to ERG, and that, with one exception,[1] he never specifically discussed ERG with Mick. Peters specifically denies passing any inside information to Mick.

In addition to these general denials, defendant Peters relies on two particular circumstances to support his argument that he would have had no access to information relating to ERG. First, he stresses the safeguards taken by West in relation to information relating to ERG. Second, he notes that for much of the time during the week preceding the tender offer announcement, he was out of the state and not in a position to learn of any information West may have had relating to ERG and Broken Hill.

West has testified that when he returned to the office on Monday, October 29, after learning the day before of the proposed Broken Hill acquisition, he began to lock his memos relating to ERG in his briefcase. He has testified that he believes it would have been impossible for Peters or anyone else to have gained access to information relating to ERG after he began to lock his briefcase.

However, the evidence submitted to the court does not support Peters' argument that it would have been impossible for him to have gained access for information relating to ERG. Rather, the record before the court indicates that Peters, and through Peters, Mick, had the opportunity to learn material, nonpublic information relating to ERG.

In addition to their joint involvement in numerous business dealings, Mick was Peters' stockbroker. Peters made a practice of calling Mick three to four times a week to discuss the stock market. In addition, they had "frequent" meetings at the IMG offices, which occurred "at least once a week." These meetings occurred before or after the regular business hours of the IMG offices, with Mick arriving as early as 7:30 A.M. or as late as 5:00 P.M.

As a partner at IMG, Peters had access to the office suite shared by the partners, and generally had access to all of West's papers relating to ERG. Peters generally had full access to all of the papers in the office at times when the suite was deserted. Peters was normally the first person to arrive at the IMG suite in the morning.

The memos prepared by West relating to ERG were ordinarily prepared and kept at the IMG offices. West maintained general files on ERG in unlocked and labeled cabinets at the office. The general files reflected the ongoing evaluation of ERG as an investment. West's memos relating to ERG were placed in a three-ring binder kept on the backbar behind his desk. The notebook was clearly labeled that it related to ERG.

West ordinarily dictated his memos while at the IMG offices. While at the office,

---

**1.** Peters does state that on one occasion, Mick called him to ask if he knew anything about what was going on with ERG. Peters responded "no," but that he knew West had been working on financing for ERG for a couple of years.

West often kept the double doors to his personal office open. West's secretary would then type the memos and place them in his ERG notebook. From his office, Peters was able to see West's business visitors entering and leaving the suite. On one occasion, West invited Swearingen, his ERG consulting colleague, to the IMG offices, where he introduced him to Peters.

Peters knew that mergers and acquisitions formed virtually all of West's work. During the summer of 1984, Peters has testified that West informed him that ERG was "heating up." West, in his deposition, refused to admit making the statement. But if it was made, he testified, the statement would have related solely to a proposed capital infusion of $100 million in ERG by Santa Fe/Southern Pacific, and not to a proposed acquisition. West's ERG memos show that originally, on August 1, 1984, the proposal was for Santa Fe to purchase $100 million of ERG preferred stock. The stock was to be convertible to common stock after a designated time. Subsequent memos, however, show that the parties had been unsuccessful in "consummating an investment-type transaction," and proposed "a business combination."

In his memo of August 22, 1984, West related the results of his discussions with ERG officers, concluding that

> Because of "vulnerability" (takeover) they cannot wait to pursue a preferred stock deal and must develop a "white knight".

Shortly thereafter, West attended a meeting with officers of Broken Hill held at the offices of ERG. In a memo from his ERG notebook dated August 31, West identified the nature of Broken Hill's interest in ERG. First, Broken Hill was seeking an independent oil company with reserves, growth potential, and management in place. Second, Broken Hill was reported to have "1 billion cash to spend—no borrowing." Finally, the memo records the desire for a quick consummation of an arrangement, stating that the Broken Hill officers "[w]ant to do a fast deal—by the end of 1984."

Broken Hill's continued interest in ERG is documented in another memo of West dated October 4. The memo states that a consultant of Broken Hill, Charles Dodson, would arrive in Wichita on October 14 and spend one or two days there. Dodson was to be accompanied during this visit by two senior officers of Broken Hill. In addition, the memo notes that Kidder Peabody, an investment banking firm, had sent a representative to "tour 1 or 2 division offices." Finally, the memo concludes that upon the completion of the visit and a return to San Francisco, where Broken Hill (USA) had its headquarters, ERG would be "on top of agenda" at a board meeting to be held October 19.

On October 17, West reported in another memo his discussions with ERG concerning the fee of himself and Swearingen. The memo states that the negotiations for the fee "will be between ½% and ¾%," a fee amount typical in acquisition consultation work. In addition, the memo states that West and Swearingen would be given input on the selection of an investment bank to perform a "fairness opinion," a common requirement for an acquisition.

In addition to the memos discussed above, all of which were placed in West's unsecured ERG notebook, West also prepared a handwritten file memo relating to ERG. This memo was typed on October 31 and placed in West's ERG notebook after he began to lock it in his briefcase. However, the handwritten version of the memo had been prepared on or around October 22 and had remained on a pad on West's desk until it was finally typed on October 31. This memo reports the conversation between Dick Volk, the chief executive officer of ERG, and John Hannan, Broken Hill's investment banker:

> John Hannan conversation 10/22/84
> —*good news*
> —meeting good—3 hours if there is any acquisition in U.S.—this is it!
> —now BHP must decide if they are going to invest in an oil company in U.S.
> —Executive committee—Wednesday, October 24
> —BHP—Friday meeting (October 26)

On Sunday, October 28, West was notified that Broken Hill had approved plans to acquire ERG. At the IMG offices the following day, he prepared a memo reporting Broken Hill's decision. The memo was orally dictated to his secretary, who then typed the memo at her desk.

As noted earlier, West began to secure his ERG notebook in his locked briefcase on Monday, October 29. However, West has also testified that he cannot absolutely state that he began to lock the briefcase on the morning of October 29. He has also stated that even after the time he began to secure the notebook, there may have been occasions when he left it sitting open on his desk while he was in another part of the suite. And West is unable to say what, if any, steps were taken by his secretary in securing the October 29 memo while it was typed. West does not know if his secretary followed her usual practice of placing finished work in an unlocked folder on the top of his desk for his review.

Although Peters stresses his travels during the week preceding the Broken Hill tender offer, the record reveals that Peters was present in the IMG offices on both October 29 and October 30. Peters returned from a trip to visit his daughter in Texas on the morning of October 29. He departed on October 30 to deliver a speech in Des Moines, Iowa, and did not return until late on October 31. But Peters states in his deposition that he was at the IMG offices during the afternoon of both October 29 and October 30. In addition, since his wife remained in Texas, Peters spent the evening of October 29 alone at home, with full access to the IMG offices. Finally, as noted earlier, both defendants Peters and Mick signed guaranties of Celtek, Inc.'s debt. One of these guaranties is dated October 29, 1984.

Another argument advanced by Peters in support of his motion for summary judgment relates to alternative sources of information relating to ERG. Peters contends that much of the trading in ERG stock would have occurred in any event, since there were public rumors that ERG was a potential acquisition target. And, in May of 1984, an investment newsletter service identified ERG as a possible target of bidding in takeover competition. Finally, Peters notes that several other investors, not defendants in the present action, purchased large amounts of ERG stock shortly prior to the tender offer announcement on November 5, 1984.

Peters relies on the deposition testimony of West that there were public rumors that "something is going to happen at ERG," and ERG officer Clark Mandigo that there was "a fairly active rumor mill" in Wichita. However, Mandigo compared the rumors relating to ERG with those experienced by other oil companies, and testified that he did not believe the level of rumors relating to ERG during 1984 was greater "than at other times during our existence." Similarly, West's testimony relates to rumors which had existed for "one, two or three years," rather than anything directly prior to the November 1984 tender offer announcement.

Moreover, there is other evidence that there were no significant rumors immediately prior to the stock purchases by the defendants. Larry Jones, a director of ERG and president of the Coleman Company, has testified that he heard no rumors relating to a possible takeover of ERG during the period leading up to the actual announcement of the tender offer. Even defendant Peters, for his knowledge of the local business community, has admitted that during 1984 he heard "nothing specific" about ERG. Peters testified that he could recall no rumors of a potential takeover of ERG.

Nor is there evidence that any specific investment authority or analyst indicated that a takeover of ERG during the latter part of 1984 was impending. The investment newsletter cited by Peters, which recommended that holders of ERG stock should retain possession "for possible bidding during takeover competition," was issued in May, 1984, nearly six months prior to the time Mick's clients began to purchase substantial amounts of ERG stock. By the time of these purchases, the opinion of the investment community had swung in

the opposite direction. Completing a study of ERG, Larry Jones found in his report that investment in ERG at the time was "risky," because of the corporation's "substantial debt ratio and its exposure to a widely anticipated trend toward lower price levels." Jones concluded the ERG situation was so risky "that investors consider it unlikely that ERG will be the target of a raider."

The evidence presented to the court is sufficient to withstand the present motion for summary judgment by defendant Peters. Reviewing all the facts in context and in the light most favorable to the plaintiff, there is sufficient evidence of insider trading by the defendants to require that the present matter proceed to trial.

Even without the October 29 memo, there was substantial information available to Peters in the other ERG memos which would have alerted a reader of the memos that an acquisition by Broken Hill was likely. These memos were kept unlocked and were available to Peters during nonbusiness hours at IMG, or to both Peters and Mick when Mick joined Peters at the IMG offices for their off-hours meetings.

These memos showed that: (1) after the proposed Santa Fe capital infusion fell through, ERG was in a serious and vulnerable position and needed to quickly find a "white knight" who would perform a friendly takeover of ERG; (2) Broken Hill had the resources and the desire for the immediate acquisition of an oil company like ERG; (3) Broken Hill had expressed an interest in ERG; (4) Broken Hill had sent to Wichita top officers and a representative of its investment banker to tour division offices; (5) ERG would be "on top of [the] agenda" at the October 19 Broken Hill board meeting; (6) on October 17, West was prepared to submit fee proposals to ERG consistent with an acquisition consultant's finder's fee; (7) the parties were preparing to select an investment banking firm to perform a fairness opinion; and (8) on October 22, the parties had a successful meeting, with the statement that, upon the meeting of the Broken Hill board on Friday, October 26, "now BHP must decide."

As discussed earlier, Peters could have gained access to the October 29 memo which would have provided final proof of the upcoming acquisition. Peters could have learned of the contents of the memo, either as it was dictated, since West often kept his office door open at IMG, or as the report was being typed and processed by West's secretary. In addition, Peters could have seen the typed memo as it awaited filing in West's ERG notebook, or could have seen the notebook itself when West left it open on his desk while in another part of the IMG office suite.

But even without the October 29 memo, a person with the investment background of Peters would have known, based upon the contents of the earlier memos, that an acquisition of ERG by Broken Hill was likely, if not imminent. The memos demonstrated that there was no other company currently in the running to serve as ERG's "white knight." Thus, when Peters returned from his trip to Texas, West's sudden concern for secrecy shown in locking up the ERG notebook would have served as an automatic signal that an acquisition was about to occur. For months, West had left the notebook open and accessible. Now, the next business day after the Broken Hill board had met to discuss ERG, West suddenly began to exercise great care to keep the contents of the notebook secret. To anyone with access to the notebook while it had been unguarded and unprotected, the timing of this abrupt concern for security would have demonstrated that an acquisition of ERG was likely in short order.

But the plaintiff's case against defendant Peters is not based solely upon his access to nonpublic information relating to ERG. Peters not only had opportunity, there is also evidence of motive in the precarious financial condition of many of the business dealings of Mick and Peters. Finally, there is evidence that Mick and Peters seized upon the opportunity to trade in ERG on the basis of nonpublic information. This evidence includes admissions by Mick to numerous witnesses that he had inside information on ERG, which derived ultimately from West and was passed on by Peters;

unusual trading activity in ERG by Mick's customers immediately prior to the announcement of the Broken Hill tender offer; and unusual payments from Mick's customers to Mick and to Peters.

The trading pattern in ERG by Mick's customers was unusual both in its volume and the methods in which it was accomplished. With regard to defendant Lounsbury, for example, the purchase in ERG stock represented a substantial departure from his previous, limited investments in the stock market. In addition, the volume of dealing in ERG by all of Mick's clients is remarkable. The purchases by Mick's four clients, which occurred primarily on Wednesday, October 31, represented fully one half of the entire nationwide level of trading in ERG stock just two days earlier. As other investors across the nation noted the increased trading in ERG and began to participate as well, the price and level of ERG trading began to increase on the remaining two days of the week. Even with this increase, the purchases by Mick's four clients represent 10% of all purchases of ERG stock throughout the nation during the week of October 29 to November 2.

In addition to the unusual volume of trading by Mick's clients, the methods used to purchase the ERG stock were unusual. For example, Mick's customer Kreutzer purchased his 10,000 shares in ERG through the use of an account in his name at another brokerage house. The only explanation in the record for Kreutzer's use of another brokerage house instead of directly through Mick is contained in the testimony of Donna Alexander. Mick himself told Kreutzer to "go down the street," so that the trading activity would not draw attention to Mick.

Having reaped substantial profits through the ERG stock, Mick's clients then returned a substantial portion of the profits to Mick, and also, directly or indirectly, to Peters. These payments were unprecedented in their size and manner. Defendant Pfeffer wired half of his $207,000.00 profits from his ERG dealings to Mick's account at the Boulevard State Bank. Pfeffer had never before paid half of his profits from an investment to his broker. At about the same time, Mick wrote a post-dated check to Peters for $43,000.00 for "consulting fees," although no actual consulting services had been supplied. Similarly, defendants Kreutzer and Doyon made payments of $16,000.00 and $25,-000.00, respectively, to Mick shortly after they realized their profits on their ERG stock. And defendant Lounsbury, as discussed below, made a substantial payment to Peters shortly after selling his ERG stock, ostensibly in payment for prior consulting services. These services, however, had been supplied over a year previously, and Peters had previously dismissed the possibility of ever receiving payment for them.

Finally, there are the admissions by Mick to several of his clients in which he indicated that he had inside information on ERG. Defendant Peters, in his motion for summary judgment, merely attempts to attack the credibility of two of the witnesses testifying to these admissions. Peters argues Pfeffer has given previous inconsistent testimony, and testified to Mick's alleged admissions under an SEC grant of immunity. He also dismisses the testimony of Sharyl Shoffner as the testimony of an embittered former girl friend of Mick. Peters' arguments may have some relevance at trial when the issue of witness credibility is before the jury, but for purposes of resolving the present motion for summary judgment, all inferences must be extended in favor of the SEC, and any doubts as to witness credibility must be resolved in favor of the SEC. In addition, it should be noted that testimony relating to Mick's admissions comes not just from Pfeffer and Shoffner, but from Nichols and Alexander, against whom there is no suggestion of a lack of credibility.

At the hearing of the present matter, defendant Peters concentrated on the statements by Mick to Nickelson, Pfeffer, Shoffner, and Alexander, arguing that the statements are inadmissible hearsay. Mick's statements, however, are admissible under a preponderance of the evidence standard. Under Fed.R.Evid. 801(d)(2)(E), a statement made by a co-conspirator is admissible

where the statement was made during the course of and in furtherance of the conspiracy. In *Bourjaily v. United States*, 483 U.S. 171, 176, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144 (1987), the Supreme Court held that when the preliminary facts relevant to a co-conspirator's statement under Rule 801(d)(2)(E) are disputed, the party offering evidence of the statement must prove them by a preponderance of the evidence. The Court also held that the co-conspirator's statements themselves can be used to help prove the existence of the conspiracy. *See also United States v. Metropolitan Enterprises*, 728 F.2d 444, 448 (10th Cir.1984).

■ Peters argues that several of the cited statements were not made in furtherance of the alleged conspiracy, and hence do not fall within the co-conspirator exception to the hearsay rule. This argument may have merit with regard to Mick's statements to Shoffner and Alexander. The court will reserve ruling on the matter, and the admissability of these statements may be tested by a motion *in limine*. However, this argument is clearly inapplicable the statements of Mick to Pfeffer and Nickelson encouraging the purchase of ERG stock. In his comments to his customers, Mick told Pfeffer and Nickelson they should purchase ERG stock because he had inside information relating to the company. Mick indicated that he had obtained this from West through Peters. These statements, which are much more important to the case against the defendants than the statements to Shoffner and Alexander, were clearly designed to further the goals of the insider trading scheme, and are thus admissible under Rule 801(d)(2)(E).

Taken together, the evidence of motive, opportunity, unusual trading in ERG stock, unusual payments among the defendants, and admissions by Mick serve to support the plaintiff's allegations. There is sufficient evidence of an insider trading scheme, and the summary judgment motion of Peters is denied.

2. Duty to Disclose

■ Peters' motion for summary judgment also argues that his actions could not, as a matter of law, constitute a violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. Peters argues that no violation exists because, under the circumstances of the case, he was not a direct fiduciary of the stockholders of ERG, and therefore had no duty to disclose the possession of material, nonpublic information.

In *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980), the Supreme Court held that the mere possession of material, nonpublic information does not itself create a duty to disclose under § 10(b). Instead, the duty to disclose under the federal securities laws arises "from a relationship of trust and confidence between parties to a transaction." 445 U.S. at 230, 100 S.Ct. at 1115.

Peters relies on *Chiarella* to suggest that the duty to disclose arises *only* when a person in possession of the information has a fiduciary relationship with the sellers of the corporation's stock. The present argument in Peters' motion for summary judgment centers on an attack of the validity of the principle of misappropriation developed in the Second Circuit Court of Appeals. Under the misappropriation doctrine, a duty to disclose may arise from a fiduciary relationship with parties other than the sellers of stock. "The prerequisite for liability under the misappropriation theory is misuse of nonpublic information in breach of a fiduciary or similar duty of trust and confidence to *some* person or entity, although that person or entity need not necessarily be a purchaser or a seller of securities." *S.E.C. v. Tome*, 638 F.Supp. 596, 618 (S.D.N.Y.1986) (emphasis in original).

It may be noted here that Peters offers no considered rationale for rejecting the misappropriation doctrine. He offers no policy supporting its rejection nor any reason why the principle of misappropriation might be inconsistent with the language or intent of Congress in adopting the Securities Exchange Act of 1934. Instead, Peters' argument is based solely on precedent—that the Supreme Court did not ex-

pressly endorse the principle in cases such as *Chiarella*.

But in *Chiarella*, the Court did not address the theory of misappropriation, which had not been submitted to the jury, and the matter was left open. Justice Stevens, concurring with the opinion of the Court, wrote that the Court was leaving for another day the issue of whether similar conduct could be punished under a misappropriation theory, and "emphasize[d] the fact that we have not necessarily placed any stamp of approval on what this petitioner did, nor have we held that similar actions must be considered lawful in the future." 445 U.S. at 238, 100 S.Ct. at 1119. (Stevens, J., concurring).

Four other justices writing in *Chiarella* expressly endorsed the misappropriation theory. Justice Brennan concurred in the Court's decision, finding that the jury had been given no instruction that misappropriation of nonpublic information could constitute a violation of § 10(b). Such an instruction, however, would have been a correct statement of the law in Justice Brennan's view, since "a person violates § 10(b) whenever he improperly obtains or converts to his own benefit nonpublic information which he then uses in connection with the purchase or sale of securities." *Id.*, at 239, 100 S.Ct. at 1120 (Brennan, J., concurring).

Chief Justice Burger, dissenting, also expressly endorsed the misappropriation theory, stating that "a person who has misappropriated nonpublic information has an absolute duty to disclose that information or to refrain from trading. *Id.*, at 240, 100 S.Ct. at 1120 (Burger, C.J., dissenting). And Justice Blackmun, joined by Justice Marshall, endorsed liability based upon an even broader view, stating that "persons having access to confidential material information that is not legally available to others generally are prohibited by Rule 10b–5 from engaging in schemes to exploit their structural informational advantage through trading in affected securities." *Id.*, at 251, 100 S.Ct. at 1126 (Blackmun, J., dissenting).

The Second Circuit first adopted the misappropriation theory in *United States v. Newman*, 664 F.2d 12 (2d Cir.1981), holding that it was not necessary under § 10(b) to prove a fiduciary relationship with the selling or purchasing stockholders. 664 F.2d at 17. Instead, the duty to disclose could also be created by the defendant's fiduciary obligations to his employers.

> In other areas of the law, deceitful misappropriation of confidential information by a fiduciary, whether described as theft, conversion, or breach of trust, has consistently been held to be unlawful. Appellee would have had to be most ingenuous to believe that Congress intended to establish a less rigorous code of conduct under the Securities Acts.

664 F.2d at 18 (citations omitted).

The misappropriation theory has been repeatedly applied. Reiterating its earlier conclusion in *Newman*, the court in *S.E.C. v. Materia*, 745 F.2d 197, 203 (2d Cir.1984), stated that "one who misappropriates nonpublic information in breach of a fiduciary duty and trades on that information to his own advantage violates Section 10(b) and Rule 10b–5." In *United States v. Carpenter*, 791 F.2d 1024, 1031 (2d Cir.1986), *aff'd by an equally divided Court*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), the court acknowledged that under *Chiarella* the mere use of information not generally available to others would not create a violation of § 10(b). However, the court held that a violation of the law occurs where the defendant has obtained the information through misappropriating information by violating "an employer-imposed fiduciary duty of confidentiality." *Id.*

The misappropriation theory has also been applied in the Third Circuit and numerous district court decisions. The Third Circuit in *Rothberg v. Rosenbloom*, 771 F.2d 818, 822 (3d Cir.1985), held that a person violates § 10(b) "when he uses insider information in violation of the fiduciary duty owed to the corporation to which he owes a duty of confidentiality."

In *S.E.C. v. Musella*, 578 F.Supp. 425, 438 (S.D.N.Y.1984), the court found that *Newman* simply "gave legal effect to the

commonsensical view that trading on the basis of improperly obtained information is fundamentally unfair, and that distinctions premised on the source of the information undermine the prophylactic intent of the securities laws." *See also United States v. Elliott*, 711 F.Supp. 425, 430–32 (N.D.Ill. 1989); *S.E.C. v. Clark*, 699 F.Supp. 839, 842–45 (W.D.Wash.1988); *S.E.C. v. Tome*, 638 F.Supp. 596, 617–20 (S.D.N.Y.1986), *aff'd*, 833 F.2d 1086 (2d Cir.1987), *cert. denied*, 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988). The misappropriation doctrine is also supported by the commentators addressing the issue. *See* ABA Comm. on Fed.Reg. of Securities, *Report of the Task Force on Regulation of Insider Trading*, Part I, 41 Bus.Law. 223, 235–37, 253–63, 270–71 (1985); Aldave, *Misappropriation: A General Theory of Liability for Trading on Nonpublic Information*, 13 Hofstra L.Rev. 101 (1984).

The misappropriation doctrine is consistent both with the language and intent of the Securities Exchange Act of 1934, and with the interpretations of the Act by the Supreme Court. Section 10(b) proscribes the use of "any manipulative or deceptive device" by "any person" in connection with "the purchase or sale of any security." Rule 10b–5 also has a similarly broad application. In *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1982), the Supreme Court recognized that the provisions of § 10(b) and Rule 10b–5 "are broad and, by repeated use of the word 'any' are obviously meant to be inclusive." The legislative history of the Securities Exchange Act of 1934 also supports a broad application of the statute's antifraud provisions, which were intended to apply to all "manipulative and deceptive practices which have been demonstrated to fulfill no useful function." S.Rep. No. 792, 73d Cong.2d Sess., 6 (1934).

The misappropriation doctrine is also consistent with subsequent expressions of con-

gressional intent.[2] In 1984, three years after the Second Circuit's adoption of the misappropriation doctrine in *Newman,* Congress passed the Insider Trading Sanctions Act of 1984 (ITSA), Pub.L. No. 98–376, 98 Stat. 1264. The ITSA did not attempt to specifically define an "insider" under the terms of the statute. The House Committee Report on ITSA indicated that such a definition was unnecessary, citing the Second Circuit's decision in *Newman:* "The Committee believes that the law with respect to insider trading is sufficiently well-developed at this time to provide adequate guidance." H.Rep. No. 355, 98th Cong., 2d Sess. 13, *reprinted in* 1984 U.S.Code Cong. & Admin.News 2274, 2286. The committee, again citing *Newman,* also expressly stated the misappropriation would constitute a violation of the antifraud provisions of the 1934 Act, finding that

> in certain widely-publicized instances, agents of tender offerors and persons contemplating a merger or acquisition have used for personal gain information entrusted to them solely for a business purpose. Such conversion for personal gain of information lawfully obtained abuses relationships of trust and confidence and is no less reprehensible than the outright theft of nonpublic information. In other areas of the law, deceitful misappropriation of confidential information by a fiduciary, whether described as theft, conversion, or breach of trust, has consistently been held to be unlawful. The Congress has not sanctioned a less rigorous code of conduct under the federal securities laws.

*Id.,* at 4–5, 1984 U.S.Code Cong. & Admin. News at 2277–78 (footnotes omitted).

Four years later, Congress took up the Insider Trading and Securities Fraud Enforcement Act of 1988 (ITSFEA). The House Committee Report on ITSFEA again explicitly endorsed the misappropriation doctrine. The report noted that the misappropriation doctrine "fulfills appropriate

---

**2.** "Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969). Indeed, the

Supreme Court has used the subsequent legislative history of the ITSA to assist in interpreting § 10(b). *See Bateman, Eichler, Hill Richards v. Berner,* 472 U.S. 299, 313 n. 23, 105 S.Ct. 2622, 2630 n. 23, 86 L.Ed.2d 215 (1985).

regulatory objectives in determining when communicating or trading while in possession of material nonpublic information is unlawful." H.Rep. No. 910, 100th Cong., 2d Sess. 26–27 (1988), U.S.Code Cong. & Admin.News 1988, pp. 6043, 6063–6064.

The misappropriation doctrine is also consistent with the interpretations accorded § 10(b) by the Supreme Court. As noted earlier, four justices indicated support for the misappropriation doctrine in *Chiarella*. In both *Chiarella* and *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), the Court itself declined to address the merits of the doctrine, resolving the cases on other grounds. However, in *Bateman, Eichler, Hill Richards v. Berner*, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985), the Court expressed support for the doctrine. The Court stated that "[w]e also have noted that a tippee may be liable if he otherwise 'misappropriate[s] or illegally obtain[s] the information.'" 472 U.S. at 313 n. 22, 105 S.Ct. at 2630 n. 22 (citing *Dirks v. S.E.C.*, 463 U.S. 646, 665, 103 S.Ct. 3255, 3267, 77 L.Ed.2d 911 (1983)).

A rejection of the misappropriation doctrine would serve to immunize a large segment of the fraudulent activity relating to the sale of securities. Chief Justice Burger identified the basis for the doctrine in *Chiarella*. Absent a confidential or fiduciary relationship, ordinarily neither party to a business transaction has a duty to disclose. This general rule

> permits a businessman to capitalize on his experience and skill in securing and evaluating relevant information; it provides incentive for hard work, careful analysis, and astute forecasting. But the policies that underlie the rule should limit its scope. In particular, the rule should give way when an informational advantage is obtained, not by superior experience, foresight, or industry, but by some unlawful means.

445 U.S. at 240, 100 S.Ct. at 1122 (Burger, C.J., dissenting).

The misappropriation doctrine is consistent with the broad language and intent of § 10(b). It is also consistent with the cases of the Supreme Court interpreting liability under § 10(b). Of the lower federal courts that have considered the issue, not one has rejected application of the doctrine.

The misappropriation theory therefore will be applied in the present case. Even though Peters may have had no direct relationship with ERG, his partnership agreement with West obliged him to keep confidential any information relating to West's work. The violation of that fiduciary duty of confidentiality will support a claim for a violation of § 10(b).

In his motion, Peters also argues that even if the misappropriation doctrine is applied, it has no relevance since there was no fiduciary obligation to the partnership to keep confidential information relating to ERG. Citing 59A Am.Jur.2d *Partnership* § 420, at 453, Peters contends that confidence applies only as to "partnership matters." Peters proceeds to argue that, since West's ERG business was excluded from the business of the IMG partnership, any information relating to ERG was not a partnership matter and Peters was subject to no obligation to keep the information confidential.

Peters' argument must be be rejected as directly contrary to the facts of the case. Peters' own testimony clearly establishes that the IMG partnership required and expected confidentiality as to the business matters of all the partners, including West's ERG business.

Q. Was it the case that you understood that the business of Investment Management Group was very confidential?

A. That was a personal observation of mine. It seems to me that even though there's nothing formal or legal as far as I know about it that, well, from a moral basis one should not talk about other people's business.

. . . .

Q. That would include all of Mr. West's business, both his Investment Management Group business as well as his exempted business? Is that the case?

A. Certainly. I didn't know much about his exempted business, but I personally believe that one should not be telling people about other people, period.

(Peters Depo., p. 47.)

Peters testified that while there was no "formal document" relating to the confidentiality of information relating to information coming into the IMG partnership, "obviously we understand that the business is very confidential." Asked whether it would be a violation of IMG policy for one partner to take information from another's partner and disclose it to outside parties, Peters responded, "Well, I would think so. You bet."

West also testified that a formal confidentiality agreement was unnecessary:

Q. The issue even come up?

A. No sir. We were all professional people. It was hardly necessary to come up. We all know what confidentiality means.

Q. That was with respect to information—the business of IMG?

A. Yes, sir.

Q. As well as your own personal business that was not the business of IMG?

A. That's correct.

(West Depo., p. 234.)

It is clear that under the expectations of the IMG partners, a partner's conversion for personal use of confidential information belonging to another partner would constitute a breach of fiduciary duty. The partnership expected that all business matters of each partner would be held in trust and confidence.

Peters' final argument is similarly unconvincing. Peters argues that the misappropriation doctrine should be applied only prospectively, if at all. However, the factors supporting a retroactive application of a new legal principle simply are not present. *See, e.g., Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971). Acceptance of the misappropriation doctrine was clearly foreshadowed in *Newman* in 1981, some three years prior to the alleged actions by the

defendants in the present case. The expectations of confidentiality among the IMG partners were known to Peters. A breach of those expectations and a betrayal of that trust, if proven, would constitute an intentional and knowing wrong. Of the cases which have applied the misappropriation doctrine, none have suggested that the doctrine should be applied prospectively only, or that the defendant's actions, which necessarily involve fraud, should escape liability.

3. Lounsbury's Motion for Summary Judgment

■ Defendant Lounsbury has also moved for summary judgment, contending, like Peters, that plaintiff SEC has failed to provide proof of insider trading by a preponderance of the evidence. Lounsbury's motion for summary judgment, like that of Peters, is hereby denied.

Lounsbury completely denies any participation in an insider trading scheme. He attributes his October 31, 1984 purchase of 10,000 shares of ERG stock to a conversation he overheard at the Petroleum Club in Wichita. However, Lounsbury's explanation of the reason for (what was for him) an unusually large investment is not wholly persuasive.

Lounsbury testified that while at a table at the Petroleum Club he overheard a conversation behind him relating to ERG. With him were Lee Poulsen, Bob Euwer, and Thomas Travis. According to Lounsbury, he heard someone behind his shoulder say he had had trouble getting in to see anyone at ERG. Lounsbury also testified that he asked Poulsen and Euwer about ERG. Euwer said he was having trouble getting in to see anyone at ERG, while Poulsen said that there was "something going on over at ERG."

Lounsbury's story does not provide a thoroughly satisfactory explanation of why this allegedly overheard conversation caused him to invest $35,000.00 in ERG stock the following day. Poulsen, Euwer, and Travis have all testified that the situation relating to ERG was not necessarily a positive one. Poulsen testified that ERG

might have been busy due to good news, or to bad news, such as an impending bankruptcy. Poulsen testified that, in any event, it was not uncommon for an energy company such as ERG to be busy in the late third or early fourth quarter. Euwer testified that information relating to ERG had "tighten[ed] up," but stated that this could have been due to developments adverse to ERG's position. Travis testified that it was possible that ERG had "closed its doors" in order to keep bad information from leaking out.

The circumstances of the events at the Petroleum Club on October 30 are also open to question. Lounsbury did not turn around to look over his shoulder at the person who allegedly made the remark that started the conversation relating to ERG. Neither Poulsen, Euwer, nor Travis could remember this conversation, although they could recall some general talk about ERG during 1984. None of the three testified that they heard the person behind Lounsbury's shoulder speaking about ERG. And most tellingly, none of the discussions relating to ERG prompted Poulsen, Euwer, or Travis to invest in ERG.

Lounsbury has admitted that, other than the allegedly overheard remark and the conversation with Poulsen, Euwer, and Travis, he knew nothing about ERG's holdings. He testified that he had heard nothing relating to a potential takeover of ERG. The information at Lounsbury's disposal relating to ERG was equivocal. It could have represented bad news as well as good news, if indeed it was news at all. Poulsen testified that similar general talk about ERG being busy had occurred several times previously. Yet, for some reason, Lounsbury went out the next day and purchased $35,000.00 of ERG stock.

This purchase was certainly unusual, given Lounsbury's investment history. From December 31, 1979 until July 26, 1986, Lounsbury purchased stock from various companies on 29 occasions. Of these other transactions, the largest investment prior to his purchase of ERG stock in October 1984 was the purchase of $11,038.00 of Standard Oil stock on February 13, 1980.

The average for Lounsbury's purchases during this period is slightly over $3200.00. Lounsbury's purchase of 10,000 shares of ERG on October 31, 1984, at $3.50 per share, thus represents an unusually large investment, an amount 10 times greater than the average of his other investments, and three times greater than his largest previous investment.

Lounsbury purchased the ERG stock with funds from an E.F. Hutton money market account. This account contained the working capital of Lounsbury's business. After selling the ERG stock four business days after its purchase, Lounsbury obtained a profit of over $24,000.00. Lounsbury then placed the proceeds from the sale of the ERG stock in his working capital account, less a portion of the proceeds which were given to defendant Peters.

According to Lounsbury, this payment to Peters simply reflects payment for consulting services rendered by Peters and Peters' IMG partner, Gamm. However, the consulting services which form the supposed basis for Lounsbury's payment were completed in July, 1983. Gamm has testified that it was unusual for a client to take over 15 months to pay for consulting services. Some clients, Gamm testified, might take two or three months to make payment. Gamm testified that Peters told him that Peters did not ever expect to receive payment from Lounsbury. Only after Lounsbury realized his substantial profit in the ERG transaction in November, 1984 did he contact Peters and ask for an invoice covering the 1983 consulting services.

When coupled with the evidence of opportunity and motive by Peters, the evidence of unusual trading activities in ERG by Mick's clients (including Lounsbury), the evidence of unusual payments back to Mick and Peters by Mick's clients (including Lounsbury), and the evidence of admissions by Mick showing an insider trading scheme, the evidence before the court is sufficient to warrant denial of defendant Lounsbury's motion for summary judgment.

### 4. Motion for Separate Trial

■ Defendant Lounsbury has also filed a motion seeking a separate trial of the claims against him. As Lounsbury acknowledges in his motion, the determination of whether to grant a motion for separate trial is left to the sound discretion of the trial judge. Reviewing the matter, the court concludes that the interests of justice are better served by the denial of defendant Lounsbury's motion for separate trial.

None of the three factors identified in *Tri–R Systems Ltd. v. Friedman & Son, Inc.*, 94 F.R.D. 726 (D.Colo.1982), the case which forms the basis for Lounsbury's motion, are present here. The first factor identified in *Tri–R Systems* is whether separate trials would further the convenience of the parties. The second factor is whether separate trials would promote judicial economy.

In the present case, these factors clearly cut against severance. The case involves a claim of a general illegal insider trading scheme, of which Lounsbury's alleged activities were but one part. The proof relating to Lounsbury's participation in the general scheme lies in part in his unusual investment in ERG shortly before the Broken Hill tender offer and in the money he paid to Peters after realizing his gain on the ERG stock. But proof of Lounsbury's participation in the scheme also involves evidence relating to the motives of Mick and Peters with regard to trading on inside information, the opportunity of Peters to acquire inside ERG information, the unusual investments in ERG by other clients of Mick, the unusual payments to Mick and Peters by other clients of Mick, and alleged statements by Mick admitting to the scheme. Holding two trials would involve a significant duplication of effort and serve only to inconvenience both the parties and the court.

The third fact identified in *Tri–R Systems* is whether the severance will avoid substantial prejudice to the parties. This forms the real basis for much of Lounsbury's argument, with the defendant contending that evidence relating to Mick and Peters will prejudice his interests. But despite his reliance on the claim of prejudice, Lounsbury cites no case authority in his brief in support of his argument that evidence relating to Mick and Peters would be unfairly prejudicial and thus inadmissible against him. Instead, Lounsbury simply suggests that because most of the evidence in the case relates just to Mick and Peters, he should receive a separate trial:

> In all, there are fifty-four (54) separate paragraphs relating to the Peters/Mick scheme and eight (8) paragraphs relating solely to the Peters/Lounsbury scheme. Further, the SEC's proposed version of the pretrial order lists in excess of 200 exhibits that it intends to offer into evidence at trial; however, less than 25 of those exhibits relate solely to the alleged Peters/Lounsbury scheme.

(Def. Lounsbury's Memo., pp. 10–11.)

While there may be a substantial amount of evidence relating directly to Mick and Peters, this does not establish prejudice to Lounsbury, since much of this evidence is still relevant to the claims against Lounsbury. These claims will receive strong corroboration if, at trial, the plaintiff is able to prove the existence of the general scheme between Mick and Peters. Lounsbury is alleged to have participated in one portion of the general scheme. The plaintiff's claim against Lounsbury will be strengthened if it proves that Mick and Peters created the general scheme to trade on insider information relating to ERG and that other customers of Mick joined this scheme.

Thus, in the present case, considerations of convenience and judicial economy strongly suggest the use of a single trial to resolve the claims against the defendants. Any prejudice resulting from the existence of a single trial is minimal, since evidence relating to the general, overall scheme to trade on ERG information forms a natural part of the claims against Lounsbury individually, and proof of the general scheme is relevant to proof of Lounsbury's alleged participation in that scheme. Since any prejudice resulting to the defendant is not substantial, and considerations of economy support a single trial, the defendant's mo-

tion should be denied. *See Tri–R Systems*, 94 F.R.D. at 728.

IT IS ACCORDINGLY ORDERED this 19 day of April, 1990, that the motions of defendants Peters and Lounsbury for summary judgment are hereby denied, and that the motion of defendant Lounsbury for a separate trial is also hereby denied.