CYNTHIA HOLCOMB HALL, Circuit Judge:
In an enforcement action brought by the Securities and Exchange Commission (“SEC”), a jury determined that John Nay-lor Clark, III (“Clark”) violated § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5 by misappropriating and using material nonpublic information regarding his employer’s plans to acquire another company. The jury also found that Clark’s stockbroker, Russell Van Moppes, who had executed Clark’s trades and had traded upon Clark’s information, had not violated federal securities laws. The district court ordered, inter alia, that Clark disgorge the profits he and Van Moppes realized. Clark appeals both the finding of liability and the disgorgement order.
We have jurisdiction under 28 U.S.C. § 1291 and we affirm.
I
Until late 1983, Clark was president of Rolyan Manufacturing Company, Inc. (“Ro-lyan”), a Wisconsin corporation which produced and sold various medical supplies. In December of that year, Smith & Nephew, pic (“SN”), a London-based multinational corporation, acquired Rolyan and renamed it Smith & Nephew Rolyan (“SNR”). SN decided to keep Clark on as president of SNR.
SN’s successful acquisition of Rolyan whetted its appetite for other medical supply manufacturers in North America. Consequently, it set up an acquisitions team to keep an eye out for appetizing takeover targets. Clark was a member of this team and attended regular meetings to discuss possible acquisition candidates. Team members were well aware that SN considered all information regarding takeovers as confidential and forbade the disclosure or personal use of such information.
Curtis Easter, SN’s vice president of finance for North American operations, was also a member of the acquisitions team. Beginning in the middle of 1984, Easter become involved in the team’s investigation of, and subsequent negotiations with, Affiliated Health Products, Inc. (“AHP”), a surgical glove manufacturer. Clark had no connection with the AHP project.
On December 12, Easter, who had just returned from a tour of AHP’s midwestern manufacturing plants, dropped into Clark’s office at SNR. Clark told Easter that he had heard that SN was planning to buy a surgical glove company. Easter, figuring that Clark knew all about the AHP project, told him that SN planned to acquire AHP in the near future. He added that SN planned to offer roughly $35 for each share of AHP’s stock.
At that point, Clark made a quick telephone call to find out the market price for AHP stock. Upon learning that the current price was about $17, he and Easter “bantered back and forth” about how much money they could make by trading in AHP stock. After a few minutes of wishful thinking, Easter ended the conversation by saying that life was “too short” to try such a scheme.
That very day, Clark made a telephone call to Bellevue, Washington. He told one of his stockbrokers, Russell Van Moppes, that he wanted to buy 2,000 shares of AHP stock because he knew that AHP was the target of a takeover attempt.[1] He also told Van Moppes that he wanted to hide his trading from his employer. After discussing various options, they concluded that the best way would be to place the AHP shares in a new account bearing someone else’s name. Clark decided to open an AHP account in his wife’s maiden name, Teresa Ann Dale. Van Moppes’ assistant misspelled Dale’s last name as “Bale.” [2] Van *442 Moppes purchased the stock on December 13 and 14. Several days later Clark, in an effort to further “bury” his trading from SN’s view, had Van Moppes' assistant change the address for the Bale account from his Wisconsin home to his in-laws’ Minnesota address. He then placed another order for 1,000 shares of AHP stock. Altogether, Clark purchased 3,000 shares of AHP stock at prices ranging from $17,875 to $19.75 per share.
Clark was not the only one to trade upon the basis of SN’s confidential plans to acquire AHP. On December 13, Dale, at her husband's urging, bought 100 shares of AHP stock at $17.65 per share. On December 26, Van Moppes bought himself 500 shares of AHP stock at $19.50 per share.[3]
SN’s designs on AHP soon reached the public. On January 4, 1985, AHP announced that it had begun preliminary discussions with a company interested in acquiring it. Ten days later, SN announced that it had agreed to purchase AHP. Specifically, SN stated that it had agreed to buy roughly three-quarters of AHP’s stock from United Industrial Corporation, AHP’s parent company. In addition, SN stated that it would purchase the remaining AHP stock from the public at $36 per share, payable in cash.
Shortly thereafter, Clark, Dale, and Van Moppes sold all of their holdings in AHP stock and realized profits of $47,466.32, $1,664.67, and $7,812, respectively.
On May 20, 1987, the SEC, acting pursuant to its authority under § 21(d) of the Exchange Act, 15 U.S.C. § 78u(d),[4] filed a complaint against Clark and Van Moppes which alleged that Clark’s misappropriation and use of SN’s material non-public information violated Rule 10b-5. It also alleged that Van Moppes had aided and abetted Clark’s violation and was liable as a tippee.
After a five-day trial, the jury returned a special verdict finding that only Clark had violated Rule 10b-5. The remedy stage of the SEC’s proceeding was left to the equitable discretion of the district court. The court entered an order (1) enjoining Clark from future Rule 10b-5 violations; (2) requiring Clark to disgorge profits which he, Dale, and Van Moppes realized from their AHP trades; and (3) imposing a $75,000 penalty on Clark pursuant to the Insider Trading Sanctions Act, 15 U.S.C. § 78u(d)(2)(A).[5]
Clark appeals his liability under the misappropriation theory. In the alternative, he appeals the order requiring him to disgorge the profits made by Van Moppes, who the jury found had not violated the federal securities laws.
II
Clark’s central claim on appeal is that misappropriation and trading on SN’s confidential information does not violate § 10(b) and Rule 10b-5. Whether the misappropriation theory should apply to this case involves questions of law and thus calls for de novo review. See United States v. McConney, 728 F.2d 1195, 1202 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). This is so even though the legal analysis becomes mixed with factual details. Id. at 1204.
Section 10(b) of the Exchange Act provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any *443 facility of any national securities exchange—
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 783(b).
Section 10(b) does not by its terms make any practice unlawful unless the SEC has adopted a rule prohibiting it. In 1942, acting under the authority of § 10(b), the SEC promulgated Rule 10b-5, which provides in relevant part:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) [t]o employ any device, scheme, or artifice to defraud, [or]
(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5.
Our task is to determine whether Congress, in enacting § 10(b), empowered the SEC to promulgate rules which would encompass the misappropriation theory. In addition, we must determine whether Rule 10b-5 was drafted such that the theory may legitimately be implied. See Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir.1984) (analysis of Rule 10b—16); see also Ernst & Ernst v. Hochfelder, 425 U.S. 185, 213-14, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976) (Rule 10b-5 cannot move beyond boundaries of § 10(b)).
A
Until recently, the bulk of trading cases involving § 10(b) and Rule 10b-5 involved a defendant who had a fiduciary or similar relationship to the shareholders of the company in whose stock he traded. This common scenario gave rise to what may be called the “classical” theory of Rule 10b-5 liability. The classical theory, as refined by the Supreme Court in Chiarella v. United States, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), and Dirks v. SEC, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), provides that
a person violates Rule 10b-5 by buying or selling securities on the basis of material nonpublie information if (1) he owes a fiduciary or similar duty to the other party to the transaction; (2) he is an insider of the corporation in whose shares he trades, and thus owes a fiduciary duty to the corporation’s shareholders; or (3) he is a tippee who received his information from an insider of the corporation and knows, or should know, that the insider breached a fiduciary duty in disclosing the information to him.
Aldave, Misappropriation: A General Theory of Liability for Trading on Nonpublic Information, 13 Hofstra L.Rev. 101, 101-02 (1984) (footnote omitted).
Significantly, the classical theory does not extend to trading on material nonpublic information by “outsiders,” i.e. persons who are neither insiders of the companies whose shares are being traded, nor tippees of such insiders. Under this definition, Clark is an “outsider.”
Unlike the classical theory, the misappropriation theory extends to trading by outsiders. Generally speaking, the theory provides that Rule 10b-5 is violated when a person (1) misappropriates material nonpublic information (2) by breaching a duty arising out of a relationship of trust and confidence and (3) uses that information in a securities transaction, (4) regardless of whether he owed any duties to the shareholders of the traded stock. See, e.g., SEC v. Materia, 745 F.2d 197, 201-02 (2d Cir.1984), cert. denied, 471 U.S. 1053, 105 S.Ct. *444 2112, 85 L.Ed.2d 477 (1985). Significantly, this analysis determines only whether there is a Rule 10b-5 violation; it does not determine whether a private party may obtain relief therefrom. See infra notes 10, 23 and accompanying text.
The government first advanced the misappropriation theory a decade ago in Chiarella, 445 U.S. 222, 100 S.Ct. 1108. Vincent Chiarella was an employee of a New York printing firm which handled announcements for corporate takeover bids. Because disclosure of the identity of the target companies could send stock prices soaring, the printer’s corporate clients took special measures not to disclose that information to the printer until the last minute. However Chiarella, on five separate occasions, used his position at the printshop to deduce the names of targeted companies. He then bought stock in those companies and resold it at substantial premiums after the takeover bids became public. Id. at 224, 100 S.Ct. at 1112. The government argued that Chiarella, by breaching a duty of confidentiality to the acquiring corporations, had misappropriated and traded upon information from his employer and thus had committed fraud on his employer’s clients and the sellers of the target companies’ securities. Id. at 235-36, 100 S.Ct. at 1118-19.
Writing for the majority, Justice Powell declined to address the merits of the government’s new theory because it had not been submitted to the jury. Id. at 236, 100 S.Ct. at 1118. However, five Justices indicated in dictum varying degrees of support for the theory.[6]
Apparently heartened by this reception (particularly by the Chief Justice’s strongly-worded dissent),[7] the government made a second attempt in United States v. Newman, 664 F.2d 12 (2d Cir.1981), cert. denied, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983). In Newman, two employees of different investment banking firms had, at Newman’s behest, misappropriated confidential tender offer information which had been entrusted to the firms’ corporate clients. Id. at 15. The two employees secretly conveyed this valuable information to Newman, a securities trader, who then told two confederates. The Newman trio immediately bought stock in the target companies and sold it at substantial premiums after the tender offers became public. They then shared their profits with the two investment bank employees who had stolen the information. Id. The district court dismissed the indictment on the grounds that Newman had defrauded neither a purchaser nor a seller of the relevant securities. Id. at 14, 19.
The Second Circuit reversed. Citing portions of Chief Justice Burger’s Chiarella dissent, the Newman court expressly adopted the misappropriation theory. The court concluded that Newman and his cohorts defrauded the investment banking firms entrusted with the information “as surely as if they took their money,” notwithstanding the fact that the firms had not traded in the relevant stock. Id. at 17. The court also observed that the defen *445 dants had wronged the firms’ corporate clients because their secret trading had artificially inflated the target companies’ stock prices. Id. at 17-18.
Significantly, although the Second Circuit referred to Chief Justice Burger’s Chiarella dissent, it did not endorse the Chief Justice’s view of the theory. To the Chief Justice, the Rule 10b-5 fraud consisted of the defendant’s failure to disclose the material nonpublie information to the parties with whom he trades. See 445 U.S. at 240, 100 S.Ct. at 1120-21 (“I would read § 10(b) and Rule 10b-5 to encompass and build on this principle: to mean that a person who has misappropriated nonpublic information has an absolute duty to disclose that information or to refrain from trading.”). To the Newman court however, the fraud consisted of the defendant’s use of the material nonpublic information despite his implicit representation not to do so. 664 F.2d at 17-18. It is Newman’s view of the theory which survives today.[8]
The Second Circuit revisited the misappropriation theory in SEC v. Materia, 745 F.2d 197 (2d Cir.1984), cert. denied, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985). Like Chiarella, Materia involved an employee of a financial printer who had misappropriated and traded upon confidential information regarding proposed tender offers by the printer’s corporate clients. Id. at 199. Unlike Chiarella, the misappropriation theory was properly preserved for appeal.
The Second Circuit noted that Newman controlled the case, but nonetheless undertook a more elaborate analysis of the misappropriation theory. The court first noted that misappropriating and trading upon information communicated in the utmost confidence fit comfortably within the meaning of “fraud or deceit” in Rule 10b-5. Id. at 201. It also observed that the legislative history negated any suggestion that § 10(b) of the Exchange Act was “aimed solely at the eradication of fraudulent trading by corporate insiders.” Id. From there the court concluded that because Materia’s breach of confidentiality and subsequent trading had damaged the reputation of the printing firm, Materia had perpetrated a fraud upon it. Id. at 202.[9]
Next, the Materia court addressed the question of whether § 10(b) and Rule 10b-5 fraud is limited to cases where the defendant has a duty to disclose her nonpublic information to the persons with whom she trades. Noting that the Chiarella Court had avoided this question, the Second Circuit concluded that a duty to disclose is relevant only to determine whether an injured buyer or seller has standing to recover damages in a private cause of action; it does not touch upon the threshold question of whether Rule 10b-5 has been violated. Id.[10]
The Second Circuit extended the misappropriation theory in United States v. Carpenter, 791 F.2d 1024 (2d Cir.1986) aff'd by an equally divided court, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). Carpen *446 ter concerned the exploits of R. Foster Winans, co-author of The Wall Street Journal’s influential “Heard on the Street” column. Winans had entered into a scheme with two stockbrokers wherein he provided information regarding the timing and content of forthcoming columns in exchange for a share of profits resulting from trades based upon that information. Id. at 1026. The government had prosecuted the defendants for violating § 10(b) and Rule 10b-5, as well as the federal mail and wire fraud statutes.
Carpenter differed from the normal misappropriation theory case in two respects. First, there was no allegation that the information was not available to the public in one form or another. Id. at 1031-32. Second, the source of the information, a financial newspaper, neither traded in the securities nor received its information from corporate clients which intended to do so. Nonetheless, a divided Second Circuit applied the misappropriation theory and affirmed the convictions.
An eight-member panel of the Supreme Court affirmed the Rule 10b-5 convictions only because it had divided evenly on them. See 484 U.S. at 24, 108 S.Ct. 316. Because the sole opinion in that decision does not state the basis for the division, we cannot know whether the four justices who voted to overturn the Rule 10b-5 convictions did so because they rejected the misappropriation theory in general or merely its novel application in that case.[11]
Nonetheless, the Second Circuit has continued to apply the misappropriation theory. See United States v. Chestman, 903 F.2d 75 (2d Cir.1990); United States v. Grossman, 843 F.2d 78 (2d Cir.1988), cert. denied, 488 U.S. 1040, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989).
District courts within the Second Circuit have also contributed to the development of the misappropriation theory. SEC v. Musella (,Musella I), 578 F.Supp. 425 (S.D. N.Y.1984), concerned the activities of Alan Ihne, an office services manager for the law firm of Sullivan & Cromwell (“Sullivan”). By virtue of his position at Sullivan, Ihne learned of numerous tender offers planned by the firm’s corporate clients. On at least four occasions, he communicated this material nonpublic information to ten of his friends, who immediately bought shares in the target companies and resold them immediately after the tender offers were announced. Id. at 431-34.[12] The government had prosecuted Ihne and his friends on both the classical and misappropriation theories of Rule 10b-5 liability. The district court noted that because none of the defendants had a fiduciary relationship to the shareholders of the target companies, they were not liable under the classical theory. Id. at 436-37. However, the court concluded that because Ihne owed Sullivan and its clients a duty to remain silent about the proposed tender offers, he and his tippees were instead liable under the misappropriation theory. Id. at 438-39. The court further stated that by adopting the misappropriation theory, “the Second Circuit gave legal effect to the commonsensical view that trading on the basis of improperly obtained information is fundamentally unfair, and that distinctions premised on the source of the information un *447 dermine the prophylactic intent of the securities laws.” Id. at 438.
This view of Rule 10b-5 surfaced again in SEC v. Tome, 638 F.Supp. 596 (S.D.N.Y.1986). In a pattern that has now become familiar, Tome was a consultant to Joseph E. Seagram & Company (“Seagram”) who exploited his confidential relationship with Seagram’s Chief Executive Officer to obtain and trade upon nonpublic information of Seagram’s plans to make a tender offer. Id. at 599.[13] The district court observed: “The common-sense notion underlying the misappropriation theory is that one who misappropriates valuable information for his own benefit, in breach of a fiduciary or similar duty of trust and confidence, has surely committed fraud on the person or entity to whom that duty is owed.” Id. at 617-18. Noting that “the scope of the duty required to ground liability is no different than the one outlined by the Supreme Court in Chiarella, and reiterated in Dirks,” the court found nothing in § 10(b) or Rule 10b-5 limiting that duty to the shareholders in the corporation in whose shares were traded. Id. at 618.[14]
United States v. Reed, 601 F.Supp. 685 (S.D.N.Y.) rev’d on other grounds, 773 F.2d 477 (2d Cir.1985), offers a different perspective on the misappropriation theory. There the defendant had allegedly misappropriated from his own father, a director of Amax Petroleum Corporation, confidential information regarding Amax’s proposed merger with Standard Oil Company of California. Id. at 689. Although the court’s lengthy discussion of the confidential relationship between father and son, id. at 703-18, does not concern us, its focus on the misappropriation theory’s consonance with common law principles of fraud and deceit is instructive:
Stripped to its essentials, outsider trading liability is premised on the common law principle that when a fiduciary profits from confidential information that he had received because of his fiduciary status, he breaches a legal duty to the person or entity that entrusted him with the information. The misappropriation of secret information for personal aggrandizement in breach of such a relationship constitutes fraud. The origins of this approach can be traced to the law of restitution. A person who receives confidential information from another and misappropriates it for personal benefit is deemed to hold the proceeds of the misappropriation in a constructive trust for the benefit of the entrusting party. The misappropriator thus becomes the trustee ex maleficio, or quasi-fiduciary, of the entrustor. In the context of the securities laws, it does not matter for purposes of assessing liability whether the recipient of the information is actually trading in the securities issued by the source of the information. Rather, the duty is breached by the misappropriation and resulting profit, and a constructive trust attaches.
Id. at 700 (citations and footnote omitted).
Further insight into how misappropriation and trading operates as fraud was recently provided in United States v. Willis, 737 F.Supp. 269 (S.D.N.Y.1990). In another novel application of the misappropriation theory, the government prosecuted a psychiatrist who had traded on confidential information communicated to him by one of his patients, the wife of a corporate insider. In holding that the indictment sufficiently alleged culpability under the misappropriation theory, the court observed:
The underlying rationale of the misappropriation theory is that a person who receives secret business information from another because of an established relationship of trust and confidence between them has a duty to keep that information confidential. By breaching that duty and appropriating the confidential information for his own advantage, *448 the fiduciary is defrauding the confider who was entitled to rely on the fiduciary’s tacit representation of confidentiality.
Id. at 274.
Thus Willis makes explicit what had been assumed by earlier decisions: that by becoming part of a fiduciary or similar relationship, an individual is implicitly stating that she will not divulge or use to her own advantage information entrusted to her in the utmost confidence. She deceives the other party by playing the role of the trustworthy employee or agent; she defrauds it by actually using the stolen information to its detriment.
In the few instances the misappropriation theory has been advanced outside of the Second Circuit, it has been welcomed by circuit and district courts alike. See Rothberg v. Rosenbloom, 771 F.2d 818, 822 (3d Cir.1985) (“An insider on either side of a proposed transaction violates [§ 10(b) ] when he uses insider information in violation of the fiduciary duty owed to the corporation to which he owes a duty of confidentiality.”); SEC v. Peters, 735 F.Supp. 1505, 1519 (D.Kan.1990) (“The misappropriation doctrine is consistent both with the language and intent of the Securities Exchange Act of 1934, and with the interpretations of the Act by the Supreme Court.”); United States v. Elliott, 711 F.Supp. 425, 431 (N.D.Ill.1989) (expressly adopting theory as articulated by Second Circuit in Materia).
In short, the amount of careful thought that has gone into the misappropriation theory is considerable, and the consistency with which it has been applied is impressive. Nonetheless, we now turn to the legislative and administrative materials themselves.
B
Rule 10b-5 has been described as a “catchall” antifraud provision. See Chiarella, 445 U.S. at 226, 100 S.Ct. at 1113 (citing Hochfelder, 425 U.S. at 202, 206, 96 S.Ct. at 1387). There are two distinct senses in which this claim is true. First, the language of the rule explicitly encompasses any purchase or sale by any person of any security.[15] There are no exemptions. The rule applies to publicly-held and privately-held companies—regardless of whether they are registered under the 1934 Exchange Act—so long as they issue something that can be called a “security.”
Second, Rule 10b-5 is a catchall because its terms are notoriously vague. Words and phrases like “fraud,” “deceit,” and “device, scheme or artifice” provide a broad linguistic frame within which a large number of practices may fit.[16] Moreover, such practices merely have to be “in connection with” security purchases or sales.
1
For guidance in determining whether the misappropriation theory fits within the concept of “fraud” in § 10(b) and Rule 10b-5, we look to the mail and wire fraud statutes, which contain similar language.[17]
*449 It is well settled that misappropriation and use of confidential information in breach of a fiduciary or similar duty amounts to fraud within the meaning of those statutes. See, e.g., Carpenter, 484 U.S. at 27-28, 108 S.Ct. at 321-22 (misappropriation of confidential newspaper information); Formax, Inc. v. Hostert, 841 F.2d 388, 390 (Fed.Cir.1988) (misappropriation of trade secrets); Louderman, 576 F.2d at 1387-88 (same).
The Supreme Court’s decision in Carpenter is particularly illuminating in this respect. The petitioner there argued that R. Foster Winans, the Wall Street Journal columnist who had misappropriated and disclosed information to his cohorts regarding the contents and timing of his column, had not committed fraud but had merely violated a few workplace rules. 484 U.S. at 27, 108 S.Ct. at 321. However, a unanimous Court had “little trouble” in finding Win-ans’ conduct a “scheme to defraud” within the ambit of the mail and wire fraud statutes. Id. at 28, 108 S.Ct. at 321. The Court observed:
The concept of “fraud” includes the act of embezzlement, which is the “ ‘fraudulent appropriation to one’s own use of the money or goods entrusted to one’s care by another.’ ” Grin v. Shine, 187 U.S. 181, 189, 23 S.Ct. 98, 102, 47 L.Ed. 130 (1902).
The Journal’s business information that it intended to be kept confidential was its property; the declaration to that effect in the employee manual merely removed any doubts on that score and made the finding of specific intent to defraud that much easier. Winans continued in the employ of the Journal, appropriating its confidential business information for his own use, all the while pretending to perform his duty of safeguarding it. In fact, he told his editors twice about leaks of confidential information not related to the stock-trading scheme, demonstrating both his knowledge that the Journal viewed information concerning the “Heard” column as confidential and his deceit as he played the role of a loyal employee.
Id. at 27-28, 108 S.Ct. at 321-22 (citation omitted) (emphasis added).
We find no linguistic reason not to apply this conception of fraud to the securities context. Thus we conclude that the misappropriation theory fits comfortably within the meaning of “fraud” in § 10(b) and Rule 10b-5.
2
Section 10(b) and Rule 10b-5 do not proscribe all frauds occurring in the business world, but only those “in connection with the purchase or sale of any security.” In other words, the fraud must somehow “touch” upon securities transactions. See Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 12-13, 92 S.Ct. 165, 168-69, 30 L.Ed.2d 128 (1971).[18] Thus the question here is whether there is some nexus between Clark’s misappropriation of SN’s confidential information and any securities transactions.
Purely as a matter of linguistic construction, we have little trouble concluding that there is. The evidence indicated that Clark’s sole purpose in obtaining the nonpublic information about SN’s plans to acquire AHP was to make a fast buck by trading in its securities. To deny a connection between the misappropriation and the subsequent trading would be disingenuous. See Materia, 745 F.2d at 203; Newman, 664 F.2d at 18.
C
Although we find that the misappropriation theory fits comfortably within the *450 broad linguistic frame of § 10(b) and Rule 10b-5, we must ensure that our interpretation “effectuate[s] the policies underlying the federal securities laws.” Securities Inv. Protection Corp. v. Vigman, 764 F.2d 1309, 1313 (9th Cir.1985). To do so, we turn to both the contemporaneous and subsequent history of § 10(b) and Rule 10b-5.
1
The legislative history of § 10(b), although extensive, is “bereft of any explicit explanation of Congress’ explicit intent.” Hochfelder, 425 U.S. at 201, 96 S.Ct. at 1385. Not surprisingly, the Exchange Act was the product of compromise between the House and Senate, which had introduced several comprehensive bills. See id. at 201-02, 96 S.Ct. at 1384-85 (describing successive bills). The Senate Report accompanying S. 3420, which contains an earlier version of § 10(b),[19] makes only two references to that provision. The first, contained in a general description of the bill, states that “effective regulation must include several clear statutory provisions reinforced by penal and civil sanctions, aimed at those manipulative and deceptive practices which have been demonstrated to fulfill no useful function. These sanctions are found in sections 9, 10, and 16.” S.Rep. No. 792, 73d Cong., 2d Sess. 6 (1934) (emphasis added). This latter phrase has been widely cited by courts endorsing the misappropriation theory to support a broad reading of § 10(b). See, e.g., Carpenter, 791 F.2d at 1030; Materia, 745 F.2d at 201; Peters, 735 F.Supp. at 1519; SEC v. Clark, 699 F.Supp. 839, 845 (W.D.Wash.1988). However, none of those courts have discussed the portion of the Senate Report specifically addressing S. 3420’s version of § 10(b). There we find a somewhat narrower expression of congressional purpose: “[§ 10(b)] authorizes the [Securities and Exchange] Commission by rules and regulations to prohibit or regulate the use of any other manipulative or deceptive practices which it finds detrimental to the interests of the investor.” S.Rep. No. 792 at 18 (emphasis added).
Significantly, this narrower purpose, aimed solely at protecting particular securities investors, yielded to a broader one. The final version of § 10(b) authorizes the SEC to proscribe practices not only for the protection of investors, but also “as necessary or appropriate in the public interest.” [20] Thus the scant legislative history on § 10(b) contains no indication that the misappropriation theory is out of step with congressional intent.
The background surrounding the adoption of Rule 10b-5 in 1942 reveals an understanding that the intent of the 1934 Congress was to proscribe a wide range of practices. For a rule that has become the centerpiece of federal securities regulation, Rule 10b-5 was subject to little deliberation by the SEC.[21] Instructive in this regard *451 are the remarks of former SEC Assistant Solicitor Milton Freeman, who actually drafted the rule. At a conference on securities regulation, Freedman discussed the SEC’s reaction to the discovery that although § 17 of the 1933 Securities Act prohibited fraud in connection with the sale of securities, there was no comparable provision proscribing fraud in connection with the purchase of securities:
I was sitting in my office in the SEC building in Philadelphia and I received a call from Jim Treanor who was then the Director of the Trading and Exchange Division. He said, “I have just been on the telephone with Paul Rowen,” who was then the SEC Regional Administrator in Boston, “and he has told me about the president of some company in Boston who is going around buying up the stock of his company from his own shareholders at $4.00 a share, and he has been telling them that the company is doing very badly [ — ] whereas, in fact, the earnings are going to be quadrupled [ — ] and will be $2.00 a share for this coming year. Is there anything we can do about it?” So he came upstairs and I called in my secretary and I looked at Section 10(b) and I looked at Section 17, and I put them together, and the only discussion we had there was where “in connection with the purchase or sale” should be, and we decided it should be at the end.
We called the Commission and we got on the calendar, and I don’t remember whether we got there that morning or after lunch. We passed around a piece of paper around to all the commissioners. All the commissioners read the rule and they tossed it on the table, indicating approval. Nobody said anything except Sumner Pike who said, “Well,” he said, “we are against fraud, aren’t we?” That is how it happened.
Remarks of Milton Freeman, Conference on Codification of the Federal Securities Laws, 22 Bus.Law. 793, 922 (1967).
In this light, it would be disingenuous to suggest that in 1942 the SEC sanctioned or even foresaw the use of the misappropriation theory. On the other hand, its apparent understanding that Congress empowered it to draft a rule to address unforeseen species of fraud squares with our reading of § 10(b)’s contemporaneous legislative history.
2
Our inquiry does not stop there, however. Our search for legislative purpose is complete only when we have considered Congress’ intent when it enacted legislation affecting the scheme of which § 10(b) and Rule 10b-5 are a part. See In re Wash. Pub. Power Supply Sys. Sec. Lit., 823 F.2d 1349, 1356 (9th Cir.1987) (en banc) (analyzing § 17(a) of the Securities Act of 1933). “While a statement concerning an earlier statute by members of a subsequent legislature is of course not conclusive evidence of the meaning of the earlier statute, the later interpretation may be accorded some deference where the subsequent legislative commentary accompanies the enactment of an amendment to the earlier law.” Yamaguchi v. State Farm Mut. Auto Ins. Co., 706 F.2d 940, 951 (9th Cir.1983).[22] Notably, the Supreme Court has itself turned to the *452 subsequent legislative history to aid in its interpretation of section 10(b). See Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 313 n. 23, 105 S.Ct. 2622, 2630 n. 23, 86 L.Ed.2d 215 (1985).
When it passed the Insider Trading Sanctions Act of 1984, Pub.L. No. 98-376, 98 Stat. 1264 [hereinafter ITSA] to amend various provisions of the 1934 Exchange Act, Congress found the misappropriation theory consistent with § 10(b) and Rule 10b-5. The House Report accompanying the bill noted that “[sjince its creation, the [SEC] has ... appropriately used the antifraud provisions to remedy unlawful trading and tipping by persons in a variety of positions of trust and confidence who have illegally acquired or illegally used material non-public information.” H.R.Rep. No. 355, 98th Cong., 2d Sess. 4, reprinted in 1984 U.S.Code Cong. & Admin.News 2274, 2277. Referring to cases such as Newman, which first adopted the misappropriation theory, the report continued,
[I]n certain widely-publicized instances, agents of tender offerors and persons contemplating a merger or acquisition have used for personal gain information entrusted to them solely for a business purpose. Such conversion for personal gain of information lawfully obtained abuses relationships of trust and confidence and is no less reprehensible than the outright theft of nonpublic information.
Id. at 2277-78 (footnote omitted) (emphasis added). Then, echoing the Second Circuit in Newman, 664 F.2d at 18, the report stated, “In other areas of the law, deceitful misappropriation of confidential information by a fiduciary, whether described as theft, conversion, or breach of trust, has consistently been held to be unlawful. The Congress has not sanctioned a less rigorous code of conduct under the federal securities laws.” Id. at 2278 (footnotes omitted).
Perhaps more significantly, Congress passed up an opportunity to supply a definition of “insider trading” at least partially because it considered contemporary Rule 10b-5 jurisprudence, which included the misappropriation theory, “sufficiently well-developed at this time to provide adequate guidance.” Id. at 2286 (footnote omitted) (citing Newman).
Four years later, Congress reaffirmed its belief that the misappropriation theory was consistent with § 10(b) and Rule 10b-5. The Insider Trading and Securities Fraud Enforcement Act of 1988, Pub.L. 100-704, 102 Stat. 4677 [hereinafter ITSFEA] was Congress’ reaction to the stock market crash of October 19, 1987, viewed by many of its members as linked to continued insider and outsider trading despite stiff ITSA penalties. See H.R.Rep. No. 910, 7, 11 reprinted in 1988 U.S.Code.Cong. & Admin.News 6043, 6044, 6048. The House Committee reporting on the bill acknowledged that the misappropriation theory had split the Supreme Court in Carpenter, yet nonetheless endorsed the theory as consistent with the broad objectives of § 10(b) and Rule 10b-5. Id. at 6047. Furthermore, in discussing an amendment to the 1934 Exchange Act expressly creating a private right of action for various securities violations,[23] the Committee noted:
[T]he codification of a right of action for contemporaneous traders is specifically intended to overturn court cases which have precluded recovery for plaintiffs where the defendant’s violation is premised upon the misappropriation theory. See, e.g., Moss v. Morgan Stanley, 719 F.2d 5 (2d Cir.1983). The Committee believes that this result is inconsistent with the remedial purposes of *453 the Exchange Act, and that the misappropriation theory fulfills appropriate regulatory objectives in determining when communicating or trading while in possession of material nonpublic information is unlawful.
Id. at 6063-64 (emphasis added).
D
The “peculiar blend of legislative, administrative, and judicial history” surrounding § 10(b) and Rule 10b-5, Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 749, 95 S.Ct. 1917, 1931, 44 L.Ed.2d 539 (1975), provides strong evidence that the misappropriation theory is compatible with the broad language of those provisions. Although the Supreme Court has yet to recognize the theory,[24] we nonetheless adopt it as it was prosecuted in this case. Specifically, we hold that an employee’s knowing misappropriation and use of his employer’s material nonpublic information regarding its intention to acquire another firm constitutes a violation of § 10(b) and Rule 10b-5.
Clark first objects to our adoption of the theory on the basis that § 10(b) and Rule 10b-5 “require that at least the person defrauded be an investor in the securities involved.” While that argument may raise interesting questions in more novel applications of the theory, it has little merit in a garden-variety misappropriation case such as this, for there is no question that the victim of the misappropriation, SN, traded in AHP’s stock and thus was defrauded by the trading activities of Clark and his tip-pees.
Clark next claims that adopting the theory in this case would introduce a “parity-of-information” rule which has been previously rejected by the Supreme Court as inconsistent with § 10(b) and Rule 10b-5, see Dirks, 463 U.S. at 654, 103 S.Ct. at 3261; Chiarella, 445 U.S. at 233, 100 S.Ct. at 1117.[25] We disagree. The misappropriation theory, as we have adopted it today, applies only where the misappropriation occurs by means of a violation of fiduciary or similar duty.[26] Thus it does not run afoul of Supreme Court precedent.
Ill
Clark next contends that even if he is liable, he should not be required to disgorge the profits realized by Van Moppes, whom the jury found did not violate the securities laws.
The SEC’s power to obtain injunc-tive relief has been broadly read to include disgorgement of profits realized from violations of the securities laws. See SEC v. Randolph, 736 F.2d 525, 529 (9th Cir.1984) (citing Handler v. SEC, 610 F.2d 656, 659 (9th Cir.1979)). We review the district court’s order to grant or deny the SEC’s request for injunctive relief for an abuse of discretion. SEC v. Rogers, 790 F.2d 1450, 1455 (9th Cir.1986).
Acknowledging that a tipper may be liable for the profits realized by his tippees, see Dirks, 463 U.S. at 664, 103 S.Ct. at *454 3266, Clark nonetheless claims that Van Moppes is not a tippee. Specifically, he claims that the jury’s failure to find Van Moppes liable indicates that “Van Moppes’ trading was motivated by his own independent analysis of AHP rather than anything Clark said to him about the stock.”
We disagree. A jury’s finding that a defendant did not violate Rule 10b-5 as a tippee does not necessarily imply a finding that the defendant had not received and acted upon an illicit tip. The jury could simply find that the defendant is not liable because he did not and should not have known that the tipper gave the advice in breach of a fiduciary duty. See Dirks, 463 U.S. at 660, 103 S.Ct. at 3264. Our review of the record indicates that the jury reached this latter conclusion. Thus, we reject Clark’s claim that the jury found that he had not given Van Moppes an illicit tip.
From here our analysis becomes fairly straightforward. It is well settled that a tipper can be required to disgorge his tippees’ profits, see, e.g., Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 165 (2d Cir.1980) (“Trades by tippees are attributed to the tipper.”), whether or not the tippees themselves have been found liable, see, e.g., SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1308 (2d Cir.) cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971); Tome, 638 F.Supp. at 617 n. 40 (dictum).[27] Such a rule is a necessary deterrent to evasion of Rule 10b-5 liability by either: (1) enriching a friend or relative; or (2) tipping others with the expectation of reciprocity. Texas Gulf, 446 F.2d at 1308. See also Dirks, 463 U.S. at 664, 103 S.Ct. at 3266 (“The elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend.”).
In this light, our review of the record leads us to conclude that the district court did not abuse its broad discretion in ordering Clark to disgorge Van Moppes’ profits.
IV
For these reasons, the judgment of the district court is AFFIRMED.

. Van Moppes testified at trial that he had not even heard of AHP until Clark spoke to him.

. Although Clark and Dale later learned of this error, they never corrected it. Indeed, Dale intentionally misspelled her own last name as "Bale” in correspondence regarding Clark's secret AHP account.

. In addition, Van Moppes had one of his other clients buy 2,000 shares of AHP stock on December 13. However this transaction is not part of this appeal.

. 15 U.S.C. § 78u(d) provides in relevant part:
Wherever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter ... [or] the rules or regulations thereunder ... it may
in its discretion bring an action in the proper district court of the United States ... and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.
It is well settled that § 21(d) permits the SEC to obtain more than injunctive relief. See infra part III.

.As amended in 1988, this provision appears in 15 U.S.C. § 78u — 1(a)(1)(A).

. In his concurrence, Justice Stevens stated that the theory could have formed the basis of a fraud action, but noted that the acquiring companies could not have recovered damages in a private action because they had not traded in the securities. Id. at 238, 100 S.Ct. at 1119-20 (Stevens, J., concurring). Chief Justice Burger and Justice Brennan would have imposed liability on the ground that anyone who misappropriates material nonpublic information has a duty to disclose the information or abstain from trading. See id. at 240, 100 S.Ct. at 1121 (Burger, C.J., dissenting); id. at 239, 100 S.Ct. at 1120 (Brennan, J., concurring in judgment). Justices Blackmun and Marshall approved of the misappropriation theory because it was consistent with their broader view that Rule 10b-5 proscribes all trading on the basis of material, nonpublic information. See id. at 251, 100 S.Ct. at 1126 (Blackmun, J., dissenting).

. Chief Justice Burger had remarked:
In sum, the evidence shows beyond all doubt that Chiarella, working literally in the shadows of the warning signs in the printshop, misappropriated — stole to put it bluntly — valuable nonpublic information entrusted to him in the utmost confidence. He then exploited his ill-gotten informational advantage by purchasing securities in the market. In my view, such conduct plainly violates § 10(b) and Rule 10b-5.
445 U.S. at 245, 100 S.Ct. at 1123 (Burger, C.J., dissenting).

. Subsequently, the Second Circuit correctly rejected Chief Justice Burger’s version of the misappropriation theory as contrary to the holdings in Chiarella and Dirks. See Moss v. Morgan Stanley, Inc., 719 F.2d 5, 16 (2d Cir.1983), cert. denied, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

. Implicit in this conclusion is the recognition that injury is an element of fraud or deceit. See generally L. Loss, Fundamentals of Securities Regulation 712 (2d ed.1988).

. The Second Circuit made this distinction two years earlier in Moss v. Morgan Stanley, Inc. 719 F.2d 5 (2d Cir.1983), cert. denied, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Arising out of the same facts as in Newman, Moss involved an action by the shareholders of the target companies’ stock who had unwittingly sold their undervalued shares to Newman and his associates. The Second Circuit held that because there was no fiduciary relationship between the bank’s corporate clients and the target firm’s shareholders, there could be no derivative relationship between the banking firm (or its employees) and the sellers. Thus, the court concluded, the sellers could not allege that the banking firm breached a duty to disclose to them nonpublic material information. Id. at 13, 15-16.
We anticipated this distinction in Polinsky v. MCA Inc., 680 F.2d 1286, 1289 (9th Cir.1982) (citing Chiarella for the proposition that duty to disclose is germane to the question of standing to maintain a private cause of action).

. One commentator has observed that
[different legal experts reacted quite differently to the Court’s four-to-four deadlock on the question of whether the Carpenter defendants had committed securities fraud. A member of the Securities and Exchange Commission insisted that the Justices had left the misappropriation theory "alive and well.” A prominent law professor, on the other hand, thought that the decision indicated “pretty strongly” that the theory was "a fairly dubious proposition.” Perhaps the least controversial appraisal was offered by a former SEC official: "The fact that it's four to four shows there is a split in the Court.”
Aldave, The Misappropriation Theory: Carpenter and its Aftermath, 49 Ohio St.L.J. 373, 374 (1988) (footnotes omitted).

. The details of the scheme are set out in a subsequent action, SEC v. Musella (Musella III), [1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,536 (S.D.N.Y.1989). Sullivan had given Ihne several memoranda emphasizing the importance of maintaining absolute secrecy of tender offer information. Ihne acknowledged that he knew it was wrong to steal the information but made a “conscious decision" to do so anyway. Id. at 93,431, 93,435.

. Like Clark, Tome not only traded in the target company’s stock, but also tipped several associates who traded in the stock. Id.

. The court also stated that the standing requirements for private Rule 10b-5 actions effectively made the misappropriation theory available only to the government. Id. at 618 n. 41. This no longer appears to be the case. See infra note 23 and accompanying text.

. See Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972) (noting that the repeated use of the word “any" in § 10(b) and Rule 10b-5 denotes a Congressional intent to have the provisions apply to a wide range of practices).

. The idea of a rule operating as a frame comes from H. Kelsen, The Pure Theory of Law 245 (M. Knight trans. 1967).

. See United States v. Louderman, 576 F.2d 1383, 1387 n. 3 (9th Cir.) (similarity of statutes’ language “ ‘is, of course, a strong indication that the[y] ... should be interpreted pari pasu.’ ") (quoting Northcross v. Memphis Bd. of Educ., 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973)), cert. denied, 439 U.S. 896, 99 S.Ct 257, 58 L.Ed.2d 243 (1978).
The mail fraud statute provides in relevant part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or so attempting to do, places in any post office ... any matter ... or takes or receives therefrom ... any such matter ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.
18 U.S.C. § 1341 (1988) (emphasis added).
The wire fraud statute provides in relevant part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of *449 false or fraudulent pretenses, representations, or promises, transmits ... by means of wire ... in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
18 U.S.C. § 1343 (1988) (emphasis added).

. We have read the "in connection with” provision somewhat more narrowly in determining whether a private plaintiff may recover damages under Rule 10b-5. See In re Financial Corp. of America Shareholder Lit., 796 F.2d 1126, 1130-31 (9th Cir.1986) (private plaintiff must show close, perhaps causal, relationship between her injury and the defendant's fraud).

.The antifraud provisions of this version are identical to those in § 10(b) as passed by Congress. The differing provisions are set forth below in italics:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
(b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance which the [Securities and Exchange] Commission may by its rules and regulations declare to be detrimental to the interests of investors.
S. 3420 at 23-24 (emphasis added), reprinted in Federal Bar Association Securities Law Committee, Federal Securities Laws: Legislative History 1933-1982, 650, 672-73 (1983).

. This broader phrase originated in two identical bills which were presented in both the House (H.R. 7852) and in the Senate (S. 2693) before S. 3420 was introduced.

. However, official SEC statements gave the opposite impression. The Release heralding the birth of the Rule stated:
The Securities and Exchange Commission today announced the adoption of a rule prohibiting fraud by any person in connection with the purchase of securities. The previously existing rules against fraud in the purchase of securities applied only to brokers and dealers. The new rule closes a loophole in the protections against fraud administered by the Commission by prohibiting individuals or companies from buying securities if they engage in fraud in their purchase.
SEC Release No. 3230 (May 21, 1942).
*451 The SEC’s Annual Report added:
During the fiscal year the Commission adopted Rule X-10B-5 as an additional protection to investors. The new rule prohibits fraud by any person in connection with the purchase of securities, while the previously existing rules against fraud in the purchase of securities applied only to brokers and dealers.
Eighth Annual Report of the Securities and Exchange Commission 10 (1942).

. In reading the subsequent legislative history of § 10(b), two courts applying the misappropriation theory have invoked the maxim in Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380-81, 89 S.Ct. 1794, 1801-02, 23 L.Ed.2d 371 (1969), that "[sjubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." Id. (footnote omitted). See Carpenter, 791 F.2d at 1030; Peters, 735 F.Supp. at 1519. However, we note that the Red Lion rule is inapplicable to subsequent legislative history. See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 2061 n. 13, 64 L.Ed.2d 766 (1980) (Red Lion rule applies to subsequent legislation; “[a] mere statement in a conference report of such legislation as to what the Committee believes an earlier statute meant is obviously less weighty.”).

. The amendment, codified in 15 U.S.C. § 78t-l (1988), provides in relevant part:
Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court [of] competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.
15 U.S.C. § 78t-1(a).

. The SEC claims that a majority of the Supreme Court has in fact recognized the legitimacy of the misappropriation theory. See Bateman Eichler, 472 U.S. at 313 n. 22, 105 S.Ct. at 2630 n. 22 (considering in pari delicto defense in tippee actions against tippers) (“We also have noted that a tippee may be liable if he otherwise misappropriate^] or illegally obtainfs] the information.”) (quotation omitted). Although several courts have swallowed the SEC’s argument, see, e.g., Peters, 735 F.Supp. at 1500; Tome, 638 F.Supp. at 619, we cannot. In the first place, because the misappropriation theory was not at issue in Bateman Eichler, the statement is obviously dictum. Moreover, two years later, when the misappropriation theory was squarely before it, the Supreme Court was evenly divided. See Carpenter, 484 U.S. at 24, 108 S.Ct. at 320.

. However, by its adoption of the ITSFEA, Congress appears to have introduced the parity-of-information rule into securities regulation. See supra at 452 and accompanying text.

. The fact that SN had no written confidentiality policy is of little moment. Clark admitted at trial that he and the other acquisition team members well understood that they were not to divulge or use information regarding SN's takeover plans. Moreover, Clark's knowledge of this fact is evidenced by his conduct in concealing his purchases of AHP. See Tome, 638 F.Supp. at 621.

. Curiously, Clark does not appeal that portion of the district court's order requiring him to disgorge the profits of his other tippee, Dale, whom the SEC had not named in its complaint.